# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| DSSC a/k/a DEMOCRATIC SENATORIAL CAMPAIGN COMMITTEE; and BILL NELSON FOR U.S. SENATE, | ) ) ) ) ) | |
| *Plaintiffs*, | ) ) | Case No. 4:18-cv-526-MW-MJF |
| v. | ) ) | |
| KENNETH W. DETZNER, in his official capacity as the Florida Secretary of State, | ) ) ) | |
| *Defendant*, | ) ) | |
| and | ) ) | |
| NATIONAL REPUBLICAN SENATORIAL COMMITTEE, | ) ) ) | |
| *Intervenor-Defendant*. | ) ) | |
| _____ | ) | |

# INTERVENOR'S RESPONSE TO PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE, AND PRELIMINARY INJUNCTION

## INTRODUCTION

Plaintiffs ask this Court to enter an extraordinary emergency injunction abrogating two longstanding, politically neutral, and generally applicable regulations that provide election officials clear and objective guidance in conducting manual recounts. Florida implemented these regulations because *Bush v. Gore*, 531 U.S. 98 (2000), held both that a vague and subjective "intent of the voter" standard—essentially what Plaintiffs seek to impose here—would be unconstitutional, and that the Equal Protection Clause affirmatively *requires* regulations like those challenged here in order to provide clear and objective guidance to election officials during manual recounts. Plaintiffs now attempt to discard that constitutional regulatory scheme and replace it with a vague, standardless regime that would actually *create* an equal protection violation. Worse still, on the eve of a manual recount, Plaintiffs ask this Court to throw out a carefully-planned system adopted pursuant to the state's Administrative Procedure Act that has been designed to ensure order in precisely this circumstance, and to enter an injunction that is sure to inject massive chaos and confusion into the manual recount process across the State.

Election recounts are highly-charged events, and Florida's regulations are an eminently reasonable, sensible, and indeed constitutionally *required* method for preserving public confidence in the integrity and impartiality of voter recounts.

Indeed, Florida's regulations have already been upheld as necessary to comply with the Constitution and remedy the equal protection problem found in *Bush v. Gore*. *Wexler v. Lepore*, 342 F. Supp. 2d 1097, 1108 (S.D. Fla. 2004). These regulations, including but not limited to the two rules challenged here, provide clear and objective guidance to election officials, eliminating chaotic and demoralizing public fights over whether a chad is sufficiently dimpled, a circle is sufficiently filled, or a mark is actually a vote or just a stray mark. And these regulations have guided officials' discretion for 18 years, during which Florida has held 15 manual recounts—none of which led to any reported challenge to any of these regulations. *See* Election Results, Fla. Div. of Elections, https://bit.ly/2RRv9F6 (drop-down menu shows election results).

Everyone agrees that votes should be counted, but Plaintiffs' effort to abrogate the well-established standards for counting votes and create a standardless free-for-all at election offices across the State, all in the hopes of sliding more votes into their column, ignores the "lesson of *Bush v. Gore* [ ] that there are countervailing concerns, such as having clear rules in advance and avoiding having courts decide the outcome of elections." Rick Hasen, *After Lessons of* Bush v. Gore*, Do Bill Nelson's Lawsuits Go Too Far in Trying to Change Florida Election Law?*, ELECTION LAW BLOG (Nov. 13, 2018), https://goo.gl/Ws6mno. Plaintiffs' last-minute effort to use the federal courts to invalidate longstanding and neutral

State regulations, and to restore a subjective and manipulable voting standard, not only violates the Constitution but undermines all the compelling interests that Florida's regulations so effectively serve, particularly the public's faith in the integrity of the recount process.

Plaintiffs should not get to change the rules just because the clock is ticking down and they are behind on the scoreboard. The Court should deny the motion for a temporary restraining order and a preliminary injunction.

## STATEMENT OF FACTS

### A.    Florida's Current Regulations Were Enacted To Cure the Constitutional Defect Found in *Bush v. Gore*.

The Florida recount in the 2000 presidential election was a debacle that still undermines the public's faith in the integrity of recount processes. "Chads," the paper fragments created by punch ballots, became infamous. The national news highlighted images of election officials, eyes enlarged in magnifying glasses, struggling to distinguish between hanging chads, swinging chads, and dimpled chads. The Supreme Court eventually held that the process was unconstitutional. *Bush v. Gore*, *supra*. Over a decade later, people still debate who won. *See, e.g.*, Wade Payson-Denney, *So, Who Really Won? What the Bush v. Gore Studies Showed*, CNN (Oct. 31, 2015), https://goo.gl/mSx8y3.

The problem, as both a practical and a constitutional matter, was that Florida's vote counters lacked any uniform standards for deciphering ambiguous

ballots. Florida law told manual recounters merely to "determine the voter's intent." FLA. STAT. § 102.166(7)(b) (1999). That left canvassing boards in Florida's 67 counties free to adopt—in their unfettered discretion—different standards for interpreting ballot markings. *See Bush*, 531 U.S. at 106 ("the standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another").

The Supreme Court held that Florida's lack of "uniform rules" violated the Equal Protection Clause. *Bush*, 531 U.S. at 106. Since Florida's vague "intent" standard had not been—and could never be—consistently applied, voters did not have an equal opportunity to have their vote counted. Uniform rules that left little or no room for canvassing board discretion, the Supreme Court said, were not only "practicable" but also "necessary." *Id.*

"In response to the election problems of 2000, the Florida legislature revised Florida's election laws in 2001," in an effort to bring them into compliance with the Supreme Court's ruling. *Wexler*, 342 F. Supp. 2d at 1107. The Florida State Senate Ethics and Elections Committee led the review and published recommendations. Among those recommendations were that "[t]he Division of Elections should be required to adopt rules containing *specific, uniform* recount substandards and procedures for each voting system in use in the State." FLA.

SENATE COMM. ON ETHICS & ELECTIONS, *Review of the Voting Irregularities of the 2000 Presidential Election* at 7 (2001) (emphasis added), https://goo.gl/AiPZB6.

The result was the Election Reform Act of 2001. The Senate committee report on that legislation emphasized that, to "*address the equal protection concerns identified by the United States Supreme Court*, the Act requires the same manner of recount to be conducted in each affected jurisdiction." FLA. SENATE COMM. ON ETHICS & ELECTIONS, REPORT ON CS/SB 1118 at 143 (2001) (emphasis added), https://goo.gl/is9oSC.

When signing the bill into law, Governor Jeb Bush explicitly acknowledged the legislature's efforts to satisfy the Equal Protection Clause: "We have eliminated the confusion [t]hanks to the good work of the Florida legislature. And we have a single standard th[at] will be used for the manual recounts." Statement of Governor Jeb Bush, *Florida Election Reform Bill Signing*, C-SPAN (May 9, 2001), https://cs.pn/2OIaJfV.

## B. Florida's Current Regulations Successfully Cure the Federal Constitutional Defect Found in *Bush v. Gore*.

Florida's current regulations are night-and-day from the standardless, discretion-ridden regime that *Bush v. Gore* held violated the Equal Protection Clause. To begin with, the Act eliminates discretion from county election officials in determining whether to conduct a recount at all. If a race is within 0.5% after the ballots are initially counted, the Act mandates a "machine recount" in all counties.

5

FLA. STAT. § 102.141(7). Ballots must be fed again through automatic tabulation machines, which must be set to sort out any ballots with "undervotes" (where the voter appears not to have selected a name in the race being recounted) and with "overvotes" (where the voter appears to have selected too many names).

If the race is within 0.25% after the machine recount, the Act mandates a "manual recount" in all counties impacted by the race. FLA. STAT. § 102.166(1). That manual recount examines only to the under- and overvotes sorted out of the machine recount, and is initially conducted by "counting teams" composed of at least two electors in each county. *Id.* § 102.166(5)(a). If the counting team cannot determine whether a particular ballot contains a valid vote, the canvassing board itself must review the ballot. *Id.* § 102.166(5)(c). In either case, the manual recounters must determine whether "there is a *clear indication* on the ballot that the voter has made a *definite choice*." *Id.* § 102.166(4)(a) (emphases added). All of this is conducted within the view of observers from each of the impacted candidates who also have an ability to raise objections. FLA. ADMIN. CODE ANN. r. 1S-2.031(3)(d).

The Act also requires the Secretary of State to promulgate guides and limits upon election officials' inquiry into whether a citizen made a definite choice for a candidate. The Act directs the Department of State to "adopt *specific rules* … prescribing what constitutes a 'clear indication on the ballot that the voter

has made a definite choice.' " *Id.* § 102.166(4)(b) (emphasis added). The rules may not simply "provide that the voter must properly mark or designate his or her choice on the ballot," nor may they "[c]ontain a catch-all provision that fails to identify specific standards, such as 'any other mark or indication clearly indicating that the voter has made a definite choice.' " *Id*. § 102.166(4)(b)(1)-(2). Under the Act, therefore, the regulations may not permit canvassing boards, in their discretion, to determine how ballots will be read. Rather, the rules must be specific enough to be uniformly applied, just as the Supreme Court ordered. *Bush*, 531 U.S. at 106.

In accordance with these directives, the Secretary promulgated FLA. ADMIN. CODE r. 1S-2.027, which establishes specific, politically neutral, generally applicable, and interrelated rules for determining voters' choices in a manual recount. Rule 1S-2.027 represents an extraordinary effort by Florida to count, to the greatest extent possible, *bona fide* votes that nevertheless do not comply with a ballot's instructions for how to cast a vote. The Rule carefully balances the State's interest in counting *all* lawful votes with its corresponding interest in counting *only* lawful votes, and thus not improperly counting as a vote what was in fact only a stray marking. As relevant here, Rule 1S-2.027 imposes two general requirements.

*First*, Rule 1S-2.027 requires consistency. If the voter selected candidates in more than one race, his vote in the recounted race is valid only if he indicated his

choice with the same marking that he used for the other races—such as circling the candidate's name. Rule 1S-2.027(4)(b). (If the voter did not vote in any other race, then for his vote in the recounted race to be counted, he must simply have cast it with one of the many approved markings described in the Rule's second general requirement.)

Demonstrating Rule 1S-2.027's careful attention to maximizing the counting of lawful votes, the Consistency Rule has exceptions for situations where a voter uses an inconsistent mark to clarify his choice (*e.g.*, where he blackens all ovals but circles one name), where he blackens most but not all of an oval, and where he blackens multiple ovals but uses words (*e.g.*, "not this" or "wrong") to clarify his choice. *See id*. r. 1S-2.027(4)(c)(7), (10), (15). Thus, in multiple ways, voters can overcome the Consistency Rule with indicia of their intent; after all, voter intent is still the ultimate question. But that indicia must be objectively clear; otherwise, Florida recounts would devolve back to the unconstitutional circumstances condemned in *Bush* where, for example, reviewers in Collier County might treat an identical ballot differently than reviewers in Leon County.

*Second*, Rule 1S-2.027 requires that a voter indicate his choice with an approved marking, and it outlines numerous scenarios delineating approved and non-approved markings. *See id.* r. 1S-2.027(4)(c)(1)-(15). These provisions set forth objective, clear, and reasonable standards for resolving ambiguous cases

8

consistently and uniformly across multiple voting jurisdictions. For example, where a marking crosses the ovals beside two candidates, and thus could imply a vote for either, under the Rule it constitutes a vote for neither. *Id.* r. 1S-2.027(4)(c)(4). These carefully crafted, interrelated rules guard against recount chaos, by requiring canvassers across Florida to interpret markings the same way across the State.

At the same time, the regulations are also remarkably voter friendly. Florida regulators have painstakingly described—and provided comprehensive images of—the many types of markings that can constitute valid votes, from mere dots, to circles, underlines, check marks, and more. *See generally id.* r. 1S-2.027(4)(c). Among the voter's options is the one that Plaintiffs challenge, namely the option to indicate a choice with simple, clear language like "not this." *See id.* r. 1S-2.027(4)(c)(15).

These interrelated requirements work in tandem to ensure that manual recounters will count as many ballots as possible while doing so in a uniform fashion across the State. One must keep in mind that the Rule applies only where a voter has "*not* marked" his choice in the recounted race "as specified in the ballot instructions" and thus has created initial uncertainty as to that choice. *Id.* r. 1S-2.027(4)(a) (emphasis added). Florida does not disregard those votes entirely; on the contrary, any number of different markings can constitute a vote. But this

permissiveness in turn requires the Consistency Rule. For if a voter uses a medley of markings—some that might comply with ballot instructions, some that might not—a canvasser has no way to determine definitively what any given marking means.

The "rules promulgated pursuant to the amended statutes" have already been held to "comply with the requirements established by *Bush v. Gore*." *Wexler*, 342 F. Supp. 2d at 1108. The regulations provide neutral, *a priori* standards for interpreting ambiguous ballots in manual recounts. More importantly, they *bind* those conducting a recount, replacing the unequal and unconstitutional treatment that led to *Bush v. Gore* with the uniform rules that the Supreme Court mandated.

### C. After the Florida Senate Race and Others Across the State Enter a Recount, Plaintiffs File This Lawsuit Challenging Longstanding, Generally Applicable, and Politically Neutral Regulations.

Florida Governor Rick Scott currently leads incumbent U.S. Senator Bill Nelson in the race for Florida's Senate seat. The race entered a machine recount because Governor Scott led Senator Nelson by less than 0.5 percentage points. Complaint ¶¶ 17-19. In addition, the Governor's race and Agriculture Commissioner's race, along with at least three state legislative races, also were ordered to machine recounts. If the lead in any of these races is less than 0.25 percentage points at the conclusion of the machine recount by the 3pm Thursday

deadline, a manual recount will be ordered for "undervotes" and "overvotes" that were set aside by the machines and not tabulated during the machine recount.

On November 13, 2018, Plaintiffs filed this lawsuit. Contemporaneously with the filing of their complaint, Plaintiffs requested an order providing that, in the event the race goes into a hand recount, election officials are enjoined from determining voter intent consistent with two rules—the Consistency Rule and Clear Statement Rule—that form an integral part of Florida's carefully considered and interrelated rules for *uniformly* determining voter intent across multiple voting jurisdictions, and in this case across multiple recounts stemming from the same election. Plaintiffs wish to replace these clear, administrable, and neutral rules with a standardless regime that requires election officials to divine, guided by little more than their own discretion and predilections, the intent of the voter.

## LEGAL STANDARD

To obtain a temporary restraining order or preliminary injunction, the movant must demonstrate that (1) "there is a substantial likelihood of success on the merits," (2) "the TRO or preliminary injunction is necessary to prevent irreparable injury," (3) "the threatened injury outweighs the harm that the TRO or preliminary injunction would cause to the non-movant," and (4) "the TRO or preliminary injunction would not be averse to the public interest." *Parker v. State Bd. of Pardons and Paroles*, 275 F.3d 1032, 1034-35 (11th Cir. 2001).

To the extent Plaintiffs seek a temporary restraining order, they are not entitled to this relief because they failed to comply with the notice and affidavit requirements of FED. R. CIV. P. 65(b). Accordingly, Plaintiffs' motion should be construed only as a request for a preliminary injunction.

## ARGUMENT

Plaintiffs bear a particularly high burden in this case for two reasons. First, we deal here with a State's constitutionally delegated power to determine "[t]he Times, Places and Manner of holding Elections for Senators and Representatives …." U.S. CONST. art. I, § 4. Thus, States are "primarily responsible for regulating their own elections," *Thompson v. Woodall*, 819 F.2d 1052, 1053 (11th Cir. 1987) (quotation marks omitted), and the Supreme Court has recognized that the administration of a recount "is within the ambit of the broad powers delegated to the States by Art. I, § 4," *Roudebush v. Hartke*, 405 U.S. 15, 25 (1972). Accordingly, "[o]nly in extraordinary circumstances will a challenge to a state election rise to the level of a constitutional deprivation." *Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986).

Second, Plaintiffs bear a particularly "heavy burden of persuasion" because they do not challenge the regulations as-applied but rather "have advanced a broad attack on the constitutionality of" a state law, "seeking relief that would invalidate [it] in all its applications …." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181,

200 (2008). "A facial challenge must fail where the statute has a plainly legitimate sweep." *Id.* at 202 (quotation marks omitted).

We first explain why the challenged regulations do not violate the Equal Protection Clause. Then we rebut Plaintiffs' hybrid First Amendment/Fourteenth Amendment claim. Finally, we explain why the remaining preliminary injunction factors weigh strongly in favor of denying Plaintiffs' motion.

# I.     THE CHALLENGED REGULATIONS DO NOT VIOLATE THE EQUAL PROTECTION CLAUSE.

## A.     Plaintiffs Seek To Replace Florida's Clear Recount Rules with the Subjective, Vague Standards Invalidated in *Bush v. Gore*.

Florida's generally applicable, politically neutral, eminently reasonable recount regulations were implemented specifically to *remedy and prevent* the equal protection violation that the Supreme Court found in *Bush v. Gore*. Plaintiffs ask this Court to discard that constitutional regulatory scheme and replace it with a vague, standardless regime that would actually *create* an equal protection violation.

1.     In *Bush*, the Supreme Court held that the Florida Supreme Court's order that election officials conduct a manual recount simply by seeking the "intent of the voter," without providing specific, neutral, and objective rules for doing so, did "not satisfy the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right." 531 U.S. at 105. The Court

explained that the general command to consider the "intent of the voter" lacked the necessary "specific standards to ensure its equal application. The formulation of uniform rules to determine intent based on these recurring circumstances is practicable and, we conclude, necessary." *Id.* at 106. Thus, the equal protection violations that the Court found included "three members of [a] county canvassing board appl[ying] different standards in defining a legal vote," *id.*, which resulted in a standardless recount procedure that was "not well calculated to sustain the confidence that all citizens must have in the outcome of elections," *id.* at 109.

Dissenting Justices Breyer and Souter agreed with the majority on this essential point. Justice Breyer indicated his agreement with the majority's rule that "the Equal Protection Clause requires that a manual recount be governed not only by the uniform general standard of the 'clear intent of the voter,' but also by uniform subsidiary standards (for example, a uniform determination whether indented, but not perforated, 'undervotes' should count)." *Id.* at 145 (Breyer, J., dissenting). Justice Souter likewise agreed that Florida's recount procedure violated the Equal Protection Clause, and he even specifically highlighted as violating equal protection principles a county's method of "determining voters' intent" without "provid[ing] a precise, uniform standard" for ascertaining that intent. *Id.* at 134 (Souter, J., dissenting).

As explained in the Statement of Facts, "[i]n response to the election problems of 2000, the Florida legislature revised Florida's election laws in 2001." *Wexler*, 342 F. Supp. 2d at 1107. "Most importantly," the statutory amendments "added language directing the Department of State to adopt specific rules for each certified voting system, prescribing what constitutes a voter's definite choice." *Id.* at 1108. And to further minimize the risk that the discretionary judgments of different canvassing boards would lead to conflicting vote counts of materially indistinguishable ballots, the Florida Legislature took especial care to prohibit the Secretary from promulgating "a catch-all provision that fails to identify specific standards, such as 'any other mark or indication clearly indicating that the voter has made a definite choice.' " FLA. STAT. ANN. § 102.166(4)(b)(2).

Florida then promulgated the comprehensive regulatory scheme pursuant to the Florida Administrative Procedure Act that is challenged here to provide election officials clear and objective guidance in how to count ambiguous votes during recounts. These rules provide in great detail the "uniform rules to determine intent" that the Supreme Court held are required by the Equal Protection Clause. *Bush*, 531 U.S. at 106. The rules have already been held to "comply with the requirements established by *Bush v. Gore*" because they "prescribe[ ] uniform, nondifferential standards for what constitutes a legal vote under each certified voting system, and have established procedures for conducting a manual recount of

overvotes and undervotes in the entire geographic jurisdiction." *Wexler*, 342 F. Supp. 2d at 1108.

Gone is the standardless, subjective inquiry into voter intent that marred the 2000 election and violated the Constitution. That old regime has been replaced with a system that has defined—*ex ante*, long before the election, in clear, generally applicable, and politically neutral rules available to the voting public literally years prior to this Election Day—precisely how election officials should determine whether marks, underlines, asterisks, are in fact *votes* and not simply stray marks, underlines, or asterisks. The urgent need for these clear rules is brought into particularly sharp relief when we recall that we deal here not with clear ballots that comply with ballot instructions but rather with noncompliant ballots that were "not marked as specified in the ballot instructions …." Rule 1S-2.027(4)(a).

Plaintiffs seek a return to the very standardless recount method that violated both the Constitution and common sense. Although *Bush* squarely held that a vague "intent of the voter" standard violates the Fourteenth Amendment, Plaintiffs ask this Court to abrogate Florida's specific regulations; override Florida's statutory prohibition against unguided, discretionary canvasser inquiry into voter intent; and enter instead a new standard, essentially identical to the one outlawed in *Bush*, that requires election officials to inquire simply and only into what a voter

supposedly "clearly indicated." Proposed Injunction ¶ 4. And they seek the extraordinary relief of a federal court injunction directed at State officials on the eve of a highly-charged recount, when such an injunction would have the inevitable effect of introducing massive confusion and chaos into the recount process.

2.     Moreover, changing the rules midstream to count votes that were invalid under the clear pre-existing rules would dilute the votes of—and thus partially disenfranchise—those whose votes were valid under the pre-existing rules. "It must be remembered that 'the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.' " *Bush*, 531 U.S. at 105 (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)). The Eleventh Circuit has already held that changing the vote-counting rules after the election has taken place and thus "counting ballots that were not previously counted would dilute the votes of those voters who met the [voting] requirements … as well as those voters who went to the polls on election day." *Roe v. Alabama*, 43 F.3d 574, 581 (11th Cir. 1995); *see also Roe v. Alabama*, 68 F.3d 404, 408 (11th Cir. 1995) (same case upholding district court injunction against post-election change in vote counting rules); *Rossello-Gonzalez v. Calderon-Serra*, 398 F.3d 1, 16 n.29 (1st Cir. 2004). Thus, Plaintiffs seek relief that would be an equal protection violation twice over,

for not only would they sap the recount process of guided uniform standards, thus ensuring differential voting results from materially identical ballots, but they would dilute the vote of those who voted consistent with Florida's long-established and plainly lawful voting standards.

3.     Notably, Plaintiffs are unable to cite a single case finding an equal protection violation in circumstances remotely similar to this one. They derive their Equal Protection standard principally from *Bush v. Gore*, which as discussed forecloses their claim, and *Obama for America v. Husted*, 697 F.3d 423, 427 (6th Cir. 2012), which involved a classification that allowed military voters a longer time to cast in-person early voting. *See* Plaintiffs' Motion 11.

This case, unlike *Husted*, does not involve a classification affording greater voting access to one class of citizens over another. Rather, we deal with citizens who have actually cast ballots, with the allegedly invidious classification simply being the State's facially and politically neutral rules for determining which ballots do, and which do not, clearly indicate the voter's definite choice. This is not an invidious or unconstitutional classification; rather it is a perfectly sensible and constitutionally *required* classification inherent in any voting system. "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort

of order, rather than chaos, is to accompany the democratic processes.' " *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). The Constitution does not forbid Florida from drawing the sensible lines that it did in defining *ex ante* those characteristics that do and do not express a clear intent to vote for a particular candidate.

## B. The Challenged Rules Provide Eminently Reasonable Standards for Identifying Overvotes and Undervotes.

Although the Court need go no further in turning back Plaintiffs' challenge, Plaintiffs are additionally wrong in arguing that the challenged rules "are plainly inappropriate under any reasonable review under the Equal Protection Clause." Plaintiffs' Motion 14, 20. To the contrary, the regulations are eminently reasonable classifications designed to ensure the consistent counting of votes and to avoid the prospect, damaging to both constitutional and civic norms, of vague, subjective, and standardless recounts occurring throughout the State in an election of great importance.

Again, Florida law provides that a vote shall be counted only "if there is a *clear indication* on the ballot that the voter has made a *definite choice*." FLA. STAT. § 102.166(4)(a) (emphasis added). To make such a "clear indication" of a "definite choice," *id.*, voters generally must "mark[ ] the ballot as specified in the ballot instructions." Rule 1S-2.027(3)(a). However, Florida law goes to extraordinary lengths in manual mandatory recounts to ensure that a voter's "clear indication [of]

a definite choice" is ascertained and recorded, even where the voter did not follow instructions and did "not mark[ ] [the ballot] as specified in the ballot instructions," *id.* r. 1S-2.027(4)(a).

This case is about how to ascertain voter intent in the small percentage of ballots where the voter failed to comply with the ballot instructions and clearly mark her vote. Plaintiffs do not challenge the great majority of the State's interrelated regulatory rules, but they do challenge two: the Consistency Rule of subsection (4)(b), and the Clear Statement Rule of subsection (4)(c)(7).

Together, the Consistency Rule and the Clear Statement Rule serve numerous functions. They safeguard the integrity of elections, and Florida "indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989). The challenged rules minimize actual or perceived partisan influence during the highly charged manual recount process, by resolving *ex ante* how election officials in 67 counties will interpret the intent of voters who have, by definition, not followed the ballot instructions for casting their votes. This State interest is of constitutional dimension, for the State may not permit its election officials to exercise unfettered discretion in resolving the ambiguity inherent in whether a chad is sufficiently dimpled or whether an *x* "marks the spot" or "crosses out a vote." *See Bush*, 531 U.S. at 106.

The regulations also minimize human error by taking as much on-the-spot judgment out of the process as possible, and replacing it with a series of clear, objective, and easily administrable rules of the road. Each of these interests is undoubtedly a compelling governmental interest. *See, e.g.*, *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) ("States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder"); *Storer*, 415 U.S. at 730.

Here is further elaboration about how these rules further these interests:

**The Consistency Rule.** The Consistency Rule provides that, when a voter has "not marked [her ballot] as specified in the ballot instructions," canvassers must determine whether the "voter's markings … [provide] a clear indication that the voter has made a definite choice in a contest" by considering whether the voter "marked [other contests] in the same manner" as the recounted contest, subject to three exceptions discussed below. Rule 1S-2.027(4)(a), (b).

The Consistency Rule must be understood in light of Florida's extraordinary effort to ascertain whether improperly marked ballots nevertheless contain *bona fide* votes. In particular, the rule must be read in light of the sheer breadth of markings that may be counted as votes notwithstanding their noncompliance with ballot instructions. For example, so long as a voter consistently marks a ballot, a voter may be counted as voting for a candidate where she simply underlines the

oval or arrow next to a candidate's name, *id.* § 4(c)(1), underlines a candidate's party affiliation, *id.* § 4(c)(3), marks a "check mark, a cross, a plus sign, an asterisk or a star, any portion of which is contained in a single oval or within the blank space between the head and tail of a single arrow," *id.* § 4(c)(4), "draws a diagonal, horizontal, or vertical line, any portion of which intersects two points on the oval and which does not intersect another oval at any two points," *id.* § 4(c)(5), or "draws a diagonal or vertical line that intersects an imaginary line extending from the center of the head of a single arrow to the center of the tail of the same arrow, provided the diagonal or vertical line does not intersect the imaginary line joining the head and tail of another arrow," *id.* § 4(c)(6), among many other marks that might count as a vote, *see generally id.* § 4(c)(7)-(15). The regulations contain numerous illustrations of the many markings that, depending on the circumstances, may qualify as *bona fide* votes, including the following:

 




Because subsection 4(c) allows a variety of marks to count as votes, the Consistency Rule of subsection 4(b) provides a very reasonable interpretive guide to ensure that the marks are actually *votes* and not, in fact, simply *stray marks*. The Consistency Rule recognizes that if a voter does not follow the ballot instructions and consistently marks, say, a "plus sign" next to a candidate's name rather than filling in the oval, it is reasonable to conclude that the plus signs that populate the ballot are in fact votes. But the Consistency Rule also recognizes that where a candidate has voted properly in some races—e.g., by properly filling in the oval next to a name for Governor, Representative, and so on—a line next to Jack Benny's name, as in the sample Attorney General ballot above, is more likely a stray mark rather than a vote, since the voter demonstrated a clear understanding of how to properly vote with respect to other elections. The Secretary's rules are clearly reasonable rules that were not challenged by any party when promulgated under Florida's Administrative Procedure Act.

Plaintiffs, by contrast, want such a vertical line or plus sign on a Senate ballot to be counted as a vote *even though* the voter plainly demonstrated an understanding of how to properly vote and did not cast a proper vote for a Senate candidate. Plaintiffs' proposed rule is not a rational interpretation of voter behavior, much less a standard required by the United States Constitution.

In short, Plaintiffs ask the Court to require canvassers to focus myopically on the markings made on the Senate race, blinding themselves to the context provided by the remainder of the ballot. But whenever the law seeks to discern intent from a legal document—whether it be a statute, a regulation, a contract, or a ballot—it always considers the context provided by the document as a whole. *See, e.g.*, *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (statutory construction); *Garcia Granados Quinones v. Swiss Bank Corp. (Overseas), S.A.*, 509 So.2d 273, 275 (Fla. 1987) (Florida contract law). At a bare minimum, Florida's neutral judgment that canvassers must consider the complete context of the entire ballot in ascertaining whether the voter has clearly indicated a definite choice to vote for a particular candidate (despite failing to follow the simple instructions on how to do so) was reasonable. Accordingly, this Court must defer to that judgment.

Plaintiffs believe the Consistency Rule will be underinclusive in particular cases, but that will virtually *always* be the case whenever there are rules to guide and cabin officials' judgments. Rules designed to consistently and uniformly

resolve ambiguity in the evidence of voter intent, as required by *Bush*, will inevitably have false positives and false negatives—and this is true even of Florida's carefully considered rules. Notably, Florida's regulations are particularly tailored to minimize under-inclusivity because they specifically exempt three circumstances from the Consistency Rule, where a voter's intent with respect to one election may be sufficiently clear notwithstanding that the voter's mark is inconsistent with how she marked her vote for other elections. *Id.* § 4(c)(7), (10), (15). One of these three exceptions is the very Clear Statement Rule that Plaintiffs also challenge.

In these ways, the Consistency Rule furthers the State's compelling interest in minimizing the risk that materially identical ballots will be counted differently by different canvassing boards. Consider the hypothetical that Plaintiffs present as their strongest case: "Example A" on page 13 of Plaintiffs' Motion:



The voter in that example has demonstrated a clear understanding that she must vote by filling in the oval next to her preferred candidate's name. In these facially ambiguous circumstances, it is entirely reasonable to resolve the ambiguity by concluding that an unmarked oval combined with the circle does not provide "a clear indication" that the voter "made a definite choice" in favor of Candidate B. First, in light of the correctly marked oval for Candidate Y for Governor, there is very little ambiguity in the voter's *failure to mark* an oval next to a candidate for Senator: the voter did *not* clearly indicate a definite choice for Senator, even as the voter clearly did indicate a definite choice for Governor. And the circle around Candidate B for Senator in this context is inherently ambiguous. Perhaps the voter circled Candidate B intending to return to the Senate race after completing the

remainder of her ballot and never did so. Perhaps she did return to that race, thought further, and ultimately decided not to vote in that race. Whatever was meant by the circle, there is good reason to question whether it was a "definite choice" because the vote for Candidate Y clearly establishes that the voter understood the instructions on how one signifies a vote. Her failure to follow those instructions in the Senate race makes it impossible to conclude that she clearly indicated "a definite choice."

**The Clear Statement Rule.** The Clear Statement Rule is likewise one of the interrelated rules that Florida has adopted to guide and control canvassing boards during highly charged manual recounts. Plaintiffs see an equal protection violation allegedly because "voters whose ballots contain an identical, clear indication of their choice in the U.S. Senate race will be treated differently solely based upon whether they also wrote one or more 'magic words' on the ballot." Plaintiffs' Motion 19. But voters who clearly indicate a definite choice with words, as permitted by the regulation, are not at all comparable—they are not similarly situated to those who do not follow these guidelines and fail to provide sufficiently clear and definite intent.

Once again, Plaintiffs' own lead hypotheticals demonstrate the fatal weakness in their position. Plaintiffs claim to see a clear intent to vote for Candidate A in Example D at page 19 of their brief, where the ovals for both

Candidate A and Candidate B are filled in, but there is an *x* over the name for Candidate A. Here is that example:



It is not at all clear that the *x* denotes "a clear indication … that the voter has made a definite choice" *not* to vote for Candidate A. Following the familiar adage that "*x* marks the spot," it is also plausible to believe that a voter would have marked the *x* to denote their preference for Candidate A. Any argument that including an additional mark like an *x* cannot plausibly be read as voting *for* Candidate A is rebutted by certain regulations that Plaintiffs do not even challenge. One of the State's regulations states that where a "voter marks all the choices for a race but further clarifies a choice for a particular candidate … *by placing an additional mark or marks showing support solely for that particular candidate*," the additional mark should denote support for that candidate. Rule 1S-2.027(4)(c)(7) (emphasis added). Similarly, "mark[ing] an 'X' … in a single oval"

denotes a valid vote. *Id.* r. 1S-2.0274(c)(4). So the voter may have believed that marking Candidate A with an *x* essentially supplanted her filling in of both ovals. Notably, Plaintiffs do *not* challenge these regulations, even though they directly contradict their argument.

Other regulations that Plaintiffs do not challenge further expose the serious weaknesses of their equal protection claim. Consider, for example, subsection (4)(c)(6), which provides that a line that intersects two separate arrows to the right of candidates' names does not count as a vote, even if the line predominantly intersects one name over another. Consider this visual accompaniment to subsection (4)(c)(6):



Because the line is *primarily* next to Jack Benny rather than Lucille Ball, some election officials may well interpret this ambiguous ballot as casting a vote for Benny—especially if they have a conscious or subconscious bias in favor of Benny or against Ball. By excluding these ambiguous votes—votes on which there is no

"clear indication" of a "definite choice"—from consideration as votes, the regulations are meant to avoid precisely these sorts of county-by-county, ballot-by-ballot discretionary judgments, that inevitably lead to conflicting results for materially indistinguishable ballots, and that can severely undermine public confidence in electoral recounts.

Plaintiffs also assert without any evidence or support that the written-words requirement may have a disparate impact on "language minorities and those with limited literacy," Plaintiffs' Motion 21, but they offer no evidence whatever in support of this factual claim. In any event, it is well settled that mere disparate impact does not suffice to establish an Equal Protection violation. *Washington v. Davis*, 426 U.S. 229, 239 (1976). Indeed, if Plaintiffs' argument were accepted, it would invalidate the well-established method of requiring write-in candidates *to be written in*, since presumably that requirement likewise has a disparate impact on those with limited literacy.

## II.   THE CHALLENGED REGULATIONS DO NOT IMPERMISSIBLY BURDEN THE RIGHT TO VOTE.

Challenges to state election laws are governed by a "flexible standard" whereby the court weighs "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the

extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

Importantly, "when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (quoting *Anderson*, 460 U.S. at 788). Thus, the Supreme Court has "repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls." *Id.* at 438.

For the reasons already explained, the two challenged rules are "reasonable, nondiscriminatory," and "politically neutral regulations." *Id.* at 434, 438. The regulations are neutral on their face and in practice, they are plainly reasonable ways to further the State's *constitutionally compelled* interest in consistency and uniformity across 67 counties of the manual recount process. And they impose only a minimal burden. Voters are not even required to comply with ballot instructions; they are simply required to cast a clearly identifiable vote in one of several ways specified in the regulations. Further, we have identified above numerous "important regulatory interests" served by the regulations, and these interests are undoubtedly "sufficient to justify the restrictions." *Id.* at 428, 434 (quotation marks omitted).

Significantly, Plaintiffs do not appear to dispute that if these regulations are indeed reasonable and nondiscriminatory, they pass muster. Instead, Plaintiffs argue that the restrictions impose a "severe" burden, and thus must be "narrowly drawn to advance a state interest of compelling importance." *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009). This argument fails for two reasons.

*First*, even if Florida had to prove that the Consistency Rule and Clear Statement Rule are narrowly drawn to advance a state interest of compelling importance, they undoubtedly are so drawn. The rules are narrowly drawn to achieve many such compelling interests; perhaps chief among those interests is *compliance with the Equal Protection Clause* as interpreted in *Bush v. Gore*. Moreover, the regulations are designed to ensure that votes are counted even if they are not marked consistent with ballot instructions, while nevertheless being narrowly drawn to secure the electoral integrity concerns discussed above.

*Second*, and more importantly, Florida's reasonable recount standards simply do not place a "severe" burden on the right to vote necessary to trigger the "narrowly drawn" standard. Plaintiffs assert that the burden is "severe" based on speculation that the challenged rules may be underinclusive and result in the "rejections of the votes" of some qualified voters. Plaintiffs' Motion 15. Plaintiffs

even suggest that "even one disenfranchised voter," *id.* at 16 (quotation marks omitted), may be sufficient to constitute a "severe" burden.

This is not the test, and it cannot be the test, for otherwise essentially every voter regulation would present a "severe" burden. "Ordinary and widespread burdens, such as those requiring 'nominal effort' of everyone, are not severe." *Tripp v. Scholz*, 872 F.3d 857, 871 (7th Cir. 2017) (quoting *Crawford*, 553 U.S. at 205 (Scalia, J., concurring)). And here, Plaintiffs are "unable to direct this Court to any admissible and reliable evidence that quantifies the extent and scope of the burden imposed by the [Florida regulation]." *Common Cause*, 554 F.3d at 1354. Plaintiffs state that the average statewide undervote range during the last three presidential elections was between 0.26% and 0.68%. Plaintiffs' Motion 17. This number on its own would not constitute a "severe" burden, but more importantly, only a very tiny fraction (if any) of those undervotes will be affected by the Consistency Rule or the Clear Statement Rule.

The *Burdick* test does not countenance Plaintiffs' myopic focus on a few voters. Petitioners improperly ask this Court "to perform a unique balancing analysis that looks specifically at a small number of voters who may experience a special burden under the statute and weighs their burdens against the State's broad interests in protecting election integrity." *Crawford*, 553 U.S. at 200. Plaintiffs' claim must fail because "on the basis of the evidence in the record it is not possible

to quantify either the magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that is fully justified." *Id. See also id.* at 205 (Scalia, J., concurring) ("[W]hat petitioners view as the law's several light and heavy burdens are no more than the different *impacts* of the single burden that the law uniformly imposes on all voters.").

The conclusion that Florida's rules do not impose a severe burden is further compelled by *Wexler v. Anderson*, 452 F.3d 1226 (11th Cir. 2006). The plaintiffs in *Wexler* raised a constitutional challenge to the fact that voters in counties using touchscreen voting machines allegedly did not have *any* meaningful opportunity for manual review of undervotes, compared to voters in counties using optical scan ballots. *Id.* at 1232. The Court held that the possibility that the plaintiffs' "ballots will receive a different, and allegedly inferior, type of review in the event of a manual recount" was not a "severe" regulation but rather a "reasonable, nondiscriminatory regulation" warranting deferential review. *Id.* at 1232-33. If the alleged *total denial* of a manual recount was not a "severe" burden in *Wexler*, it follows *a fortiori* that a "severe" burden is not presented by Plaintiffs' objection to the eminently reasonable and duly enacted method of providing them a recount.[1]

---

[1] Plaintiffs' proposed injunction also asks this Court to stay the November 18 canvassing deadline, Proposed Injunction ¶ 7, but Plaintiffs provide no argument about why this extraordinary relief is necessary or appropriate.

## III.   THE REMAINING PRELIMINARY INJUNCTION FACTORS WEIGH STRONGLY IN FAVOR OF DENYING PLAINTIFFS' ELEVENTH-HOUR REQUEST FOR RELIEF.

The balance of the harms and the public interest further counsel in favor of denying Plaintiffs' motion, for at least four reasons.

*First*, discarding Florida's long-established and facially neutral rules would transmogrify an objective, predictable manual recount process into a subjective, standardless system that relies solely on the discretion of election officials to determine voter intent. Such a system would seriously undermine the integrity of Florida's election process, and it would irreparably harm voters' and the NRSC's right to an election conducted according to long-established rules rather than eleventh hour *ad hoc* rules designed to liberate local election officials to exercise precisely the unfettered discretion condemned in *Bush*.

*Second*, a court order enjoining state election law after votes have been cast and fairly counted would be seriously disruptive to the election process. When faced with a request to enjoin election procedures immediately before an election, a court must "weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). *See also Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018). Even "seemingly innocent alterations in election rules" can result in "danger[ous] unanticipated consequences." *Griffin v. Roupas*, 385 F.3d 1128, 1132

(7th Cir. 2004). Thus, it is no surprise that courts overwhelmingly seek to avoid changing voting laws immediately *before* an election, much less *after* an election. *See, e.g.*, *Arizona Sec'y of State's Office v. Feldman*, 137 S. Ct. 446 (2016); *North Carolina v. League of Women Voters of N.C.*, 135 S. Ct. 6 (2014); *Nader v. Keith*, 385 F.3d 729, 736 (7th Cir. 2004).

*Third*, in addition to any unanticipated consequences, discarding these critical vote identification rules at this stage would dilute the votes of those who voted in accordance with Florida law, allow freewheeling canvasser inquiry into voter intent, facilitate partisan bias, raise practical difficulties in the vote tabulation process, interfere with state election certification deadlines, disrupt post-election procedures, and erode public confidence in the integrity and impartiality of the voter recount process. "[A]n injunction at this time would have a chaotic and disruptive effect upon the electoral process." *Fishman v. Schaffer*, 429 U.S. 1325, 1330 (1976).

*Fourth*, Plaintiffs' proposed injunction would enjoin the application of state statutes and regulations, and "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, Circuit Justice).

## CONCLUSION

This Court should deny Plaintiffs' emergency motion for a temporary restraining order and a preliminary injunction and to show cause. If the Court is nonetheless inclined to grant injunctive relief to the Plaintiffs, we ask the Court to enter a stay of that relief pending Intervenors' appeal to the Eleventh Circuit.

## LOCAL RULE 7.1(F) CERTIFICATION

The undersigned certifies that this motion contains 8,000 words.

Date: November 15, 2018                    Respectfully submitted,


                                           /s/ George T. Levesque
                                           Andy Bardos (FBN 822671)
Charles J. Cooper*                         George T. Levesque (FBN 555541)
Michael W. Kirk*                           GRAYROBINSON, P.A.
William C. Marra*                          Post Office Box 11189
Davis Cooper*                              Tallahassee, Florida 32302-3189
Joseph O. Masterman*                       Telephone: 850-577-9090
COOPER & KIRK, PLLC                        andy.bardos@gray-robinson.com
1523 New Hampshire Avenue, N.W.            george.levesque@gray-robinson.com
Washington, D.C. 20036
Telephone: 202-220-9600
ccooper@cooperkirk.com
mkirk@cooperkirk.com
wmarra@cooperkirk.com
pdcooper@cooperkirk.com
jmasterman@cooperkirk.com

* pro hac vice applications
provisionally granted


        Attorneys for the National Republican Senatorial Committee