UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| DSCC a/k/a DEMOCRATIC SENATORIAL CAMPAIGN COMMITTEE and BILL NELSON FOR U.S. SENATE,<br>    Plaintiffs,<br>v.<br>KENNETH DETZNER, in his official capacity as the Florida Secretary of State,<br>    Defendant. | Case No. 4:18-cv-00526 |

**SECRETARY'S RESPONSE IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**I.     Introduction**

The Florida Legislature revised Florida's election laws in the Florida Election Reform Act of 2001.[1] *See* ch. 2001-40, Laws of Florida. Among other things, the Act amended the manual recount statute to specify that a manual recount would include the counting of both undervotes and overvotes. *Wexler v. Lepore*, 342 F.Supp 2d 1097, 1107 (S. D. Fla. 2004). Critical here, the Florida Legislature also amended the statute to require the Department of State to adopt specific rules prescribing what constitutes a voter's definite choice. *See* § 102.166(4)(b), Fla. Stat. In response to that rulemaking authority, the Department

---

[1] This response refers to Kenneth Detzner as "Secretary," the Plaintiffs collectively as "the Plaintiffs," and docket entries before this Court as "DE" followed by the appropriate citation.

1

of State, Division of Elections adopted Rule 1S-2.207 (the "Uniform Provision") in 2002.

The Division amended the Uniform Provision in 2008. The Democratic Party quickly challenged that amendment. *See Fla. Democratic Party v. Dep t. of State, Div. of Elections*, Case No. 08-3485 (DOAH Aug. 4, 2008)[2]. The Secretary settled the case by adding a sentence noting the Uniform Provision only applied to a manual recount.

A review of the Division of Elections' Election Results Archive shows that fifteen manual recounts have been performed since adoption of the Uniform Provision in 2002, with ten of those occurring after the 2008 amendment.[3]

Now, 10 years later, the Plaintiffs challenge the constitutionality of the Uniform Provision on the eve of a manual recount. Changing the rules—rules in place for some time—in the middle of an election undermines significant State interests in the "smooth and effective administration of the voting laws" under "legitimate statutory processes." *Summit Cnty. Dem. Cent. & Exec. Comm. v. Blackwell,* 388 F.3d 547, 551 (6th Cir. 2004). The Plaintiffs simply waited too long to seek relief. *See, e.g., Benisek v. Lamone,* 138 S. Ct. 1942, 1944 (2018).

---

[2] *Available at* https://www.doah.state.fl.us/DocDoc/2008/003485/08003485_08042008_0118099 0.pdf
[3] *See* https://results.elections.myflorida.com/ (last visited 11/15/18).

## II. Relevant Legal Standards

The Plaintiffs state that the substantive standards for a temporary restraining order and a preliminary injunction are the same. DE 3-1 at 10. The Secretary agrees. The relief the Plaintiffs seek "is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *Keister v. Bell,* 879 F.3d 1282, 1287 (11th Cir. 2018) (collecting citations). The four requisites the Plaintiffs "must clearly establish" are: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the [P]laintiff[s] outweighs the potential harm to the [D]efendant; and (4) that the injunction will not disserve the public interest." *Id.* (citations omitted). The rule governing preliminary injunctions "does not place upon the non-moving party the burden of coming forward and presenting its case against a preliminary injunction." *Ala. v. U.S. Army Corps of Eng'rs,* 424 F.3d 1117, 1136 (11th Cir. 2005) (citations omitted). It bears emphasizing that "[a] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek,* 138 S. Ct. at 1944. The requirement "is as true in election law cases as elsewhere." *Id.*

## III. Argument

This Court should deny the Plaintiffs' request for extraordinary relief because the Plaintiffs fail to satisfy any one of the four requisites that they must

"clearly establish." *Keister,* 879 F.3d at 1287. The Plaintiffs cannot show a substantial likelihood for success on the merits or irreparable harm. Nor can the Plaintiffs show that the equities and public interest favor them.

### A.   *The Plaintiffs cannot clearly establish substantial likelihood of success on the merits.*

#### 1.   The Plaintiffs' Undue Burden Claim Fails

The *Anderson-Burdick* standard ordinarily governs when parties raise comingled, election-related claims under the First and Fourteenth Amendments. This standard seeks to balance the burdens that election laws impose on the right to vote with the justification for those burdens. *See Anderson v. Celebrezze,* 460 U.S. 780, 789 (1983); *Burdick v. Takushi,* 504 U.S. 428, 433 (1992). In considering the level of scrutiny to apply when considering a challenge to an election law, the *Anderson-Burdick* standard states that this Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick,* 504 U.S. at 434.

The burden imposed by the Uniform Provision is minimal. Indeed, the Uniform Provision *alleviates* another greater burden facing voters. All Florida

4

voters voting on a paper ballot must read and follow the ballot instructions.[4] Failure to do so may mean that a vote in a particular race is not counted. Some voters, of course, will inevitably fail to follow the instructions. Even where a voter mismarks the ballot, Florida law provides a safety net. *See* §102.166(4)(a), Fla. Stat. (providing that a vote "shall be counted if there is a clear indication on the ballot that the voter has made a definite choice"). The Uniform Provision sets out clear standards to assist the reviewer in determining the voter's intent, even if the voter did not follow the instructions. *See* R. 1S-2.027, F.A.C. In other words, the Uniform Provision is part of a *remedy* for mismarked ballots, and thus alleviates the burden of marking the ballot according to instructions.

Furthermore, the burden imposed by the Uniform Provision arises only in scenarios in which it is impossible to ascertain the voter's intent. For instance, the Plaintiffs assert that the Consistency Requirement imposes a burden when the vote for senator is not counted in the following scenario:

---

[4] Florida law requires a uniform ballot design. *See* §101.151, Fla. Stat. (2018); R. 1S-2.032, F.A.C. Paper ballots must include a "vote target," which is either an oval, square, rectangle, or a "broken arrow." R. 1S-2.032(10)(e), F.A.C. The ballot must instruct the voter to completely fill in the oval, square, or rectangle vote target, or in the case of a broken arrow vote target, to "connect the head and the tail of the arrow pointing to your choice." R. 1S-2.032(10)(d)(1), F.A.C. The paper ballot must also state: "If you make a mistake, ask for a new ballot. Do not cross out or your vote may not count." R. 1S-2.032(10)(d)(1), F.A.C.

5

Voter A:

| REPRESENTATIVE | COMMISSIONER OF EDUCATION |
|---|---|
| ○ Candidate A | ● Candidate Q |
| ● Candidate B | ○ Candidate R |
| ○ Candidate C | ○ Candidate S |

| GOVERNOR | SENATOR |
|---|---|
| ○ Candidate L | ○ Candidate X |
| ● Candidate M | ○ Candidate Y |
| ○ Candidate N | ⟨○ Candidate Z⟩ (circled) |

The Plaintiffs assert that, in this scenario, the voter's "marks…plainly and unequivocally indicate the voter's definite choice." *See* Example A, DE 3-1, at 13; DE 3-1, at 15. This is clearly untrue. Voter A could have intended a variety of things by this mark. Perhaps Voter A was marking this race to come back to it later. Perhaps Voter A considered voting for Candidate Z, but ultimately decided to leave the race blank. Reasonable minds can differ as to the intent of the voter in this instance.

Similarly, the Plaintiffs assert that the so-called "Magic Words" Requirement imposes a burden on voters who overvote their ballot. DE 3-1, at 8 (citing R. 1S-2.207(c)(15), F.A.C.) More specifically, the Plaintiffs argue that this provision is too limited because it does not specify other methods of conveying their correct choice. DE 3-1, at 9. The alternative marks offered by Plaintiffs,

6

however, are not clear indicia of the voter's choice. The Plaintiffs point to a scenario in which a voter in a two-candidate race fills in both ovals but strikes through the name of one candidate. DE 3-1, at 20. Voter intent cannot be readily ascertained here. Perhaps the voter voted for Candidate A by mistake and attempted to cancel that vote by striking out the candidate's name. Alternatively, the voter could have struck through Candidate A's name and filled in the oval for Candidate B, only to later decide to fill in the oval for Candidate A. The Plaintiffs' "Example D" is similarly problematic.



Here, the voter could have initially voted for Candidate B, while intending to vote for Candidate A. The voter then filled in the oval for Candidate A, and emphasized that vote with an additional mark. In either of these scenarios, the voter's written comments provide clarity that the extra marks simply cannot. In the absence of written guidance, the reviewer cannot determine what the voter's mismarks mean.

7

In short, the Uniform Provision *alleviates* the burdens faced by voters much more often than it imposes burdens on voters. And that burden arises only where there is no clear-cut indication of the voter's intent. Under *Anderson-Burdick*, this burden must be weighed against the State's interests. *Burdick,* 504 U.S. at 434. Since the voter's interest is burdened only when their intent is unclear, that interest must give way to the State's "legitimate interest in ensuring an orderly and consistent counting of each election ballot," *Summit,* 388 F.3d at 551, and the State's "compelling interest in preserving the integrity of its election process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (quoting *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989)); *see also Burdick*, 504 U.S. at 434 ("when a state election law provision imposes only reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions.") (internal quotations and citation omitted).

2. **The Plaintiffs' Equal Protection Claim Fails**

The Constitution extends protection to the right of all qualified citizens to vote in state and federal elections and the right to have those votes counted without dilution as compared to the votes of others. *Bodine v. Elkhart Cty. Election Bd.*, 788 F.2d 1270, 1271 (7th Cir. 1986). To state an equal protection claim, however, a plaintiff must allege the existence of an intentional or purposeful discrimination

by authorities in which one class is favored over another. *See Bd. of Election v. Libertarian Party*, 591 F.2d 22, 24-25 (7th Cir. 1979) (ballot placement claim under the equal protection clause requires a showing of "an intentional or purposeful discrimination"). The evidence must show both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 955 (4th Cir. 1992); *see also Martinez v. Bush*, 234 F. Supp. 2d 1275, 1278 (S.D. Fla. 2002) (citing *Davis v. Bandemer*, 478 U.S. 109, 131 (1986)). Plaintiffs can show neither in this case.

While the Plaintiffs contend the Uniform Provision disparately impacts similarly situated voters, their Complaint does not allege that it was the Division of Election's intent to do so. Indeed, the Uniform Provision clearly states that it applies "in all instances" where a ballot has been mismarked by the voter. Fla. Admin. Code R. 1S-2.027(4)(a). It is this equal application that makes the Uniform Provision "neutral in character," and insulates it from any equal protection violation. *See Sangmeister v. Woodard*, 565 F.2d 460, 468 (7th Cir. 1977) (requiring on remand that any ballot position provision be neutral in charter).

There is no proof, and none has been offered, that the Secretary intended the Uniform Provision to disproportionately impact any particular class or party of voters. "The difficulty is that *every* electoral law and regulation necessarily

9

has *some* impact on the right to vote, yet to strike down every electoral regulation that has a minor impact on the right to vote would prevent states from performing the important regulatory task of ensuring that elections are fair and orderly." *Weber v. Shelly*, 347 F.3d 1101, 1106 (9th Cir. 2003). The clear rationale behind the Uniform Provision is that different ballot mismarks inevitably lead to different conclusions regarding the voter's intent. Therefore, in order to ensure that any recount was fair and orderly, it was necessary to adopt standards to guide determinations of voter intent.

The Plaintiffs have similarly failed to show any disparate impact in light of the Uniform Provision's neutral application. The Plaintiffs fail to identify any political party, race, or other group that is more likely to have its mismarked ballots rejected than another. And, it can hardly be said that there is any particular connection between casting an improper ballot and one's political party, age, race, or gender. Indeed, it appears that method of voting, rather than any other factor is the most likely indicator of under or overvoting. *See* Fla. Dep't of State, *Analysis and Report of Overvotes and Undervotes for the 2016 General Election*, at 17 (Jan. 31, 2017).[5]

Instead of identifying a disparately impacted group, the Plaintiffs generally assert that the Consistency and Magic Words Requirements "impose different and

---

[5] https://dos.myflorida.com/media/697477/overundervotereport-2016.pdf (last visited 11/15/18)

severe burdens on the right to vote for qualified voters who are similarly situated." DE 3-1 at 20, 24. However, this is simply not the case. Every voter's ballot will be reviewed under the same rules.

The U.S. Supreme Court's decision in *Bush v. Gore,* neither alters the applicable equal protection framework nor requires a contrary result. In *Bush,* the U.S. Supreme Court issued a ruling "limited to the present circumstances." *Id.* at 109. The U.S. Supreme Court held that Florida's court-ordered statewide recount denied equal protection because the recount lacked "specific standards to ensure its equal application" from ballot to ballot, precinct to precinct, or recount team to recount team when determining a voter's intent. *Id.* at 106. This resulted in a process without "sufficient guarantees of equal treatment"—a recount without "minimal procedural safeguards" to ameliorate unequal treatment. *Id.* at 107-109. Because the U.S. Supreme Court limited *Bush* to the circumstances of that case, it does not apply here. Even if it did, the Uniform Provision satisfies *Bush*'s requirements.

First, the Uniform Provision establishes a single, uniform set of guidelines for determining voter intent. An earlier version of the provision was examined by the Southern District and found to satisfy *Bush v. Gore*:

> The Court finds that the rules promulgated pursuant to the amended statutes comply with the requirements established by *Bush v. Gore*. Defendants have prescribed uniform, nondifferential standards for what constitutes a legal vote under each certified voting system,

11

and have established procedures for conducting a manual recount of overvotes and undervotes in the entire geographic jurisdiction. *See* Rules 1S-2.031(6), 1S-2.027, and 1SER04-1.

*Wexler*, 342 F.Supp 2d at 1108.  The Uniform Provision, contrary to the Plaintiffs' contention, in fact, removes arbitrariness from the decision making process.  The Plaintiffs, by contrast, would rather have this Court remove these uniform guidelines and replace them with its own rules, which would harken back to the *ad hoc* decision-making that existed in the time of *Bush*.

Second, there are implicit safeguards built into any determination made in a manual recount.  To begin, any manual recount "shall be open to the public." §102.166(3), Fla. Stat.  Additionally, the statute provides that a counting team, when possible, should "have members of at least two political parties," and does not allow a candidate involved in the race to be a member of the counting team. §102.166(5)(a), Fla. Stat.  Finally, "if a counting team is unable to determine whether the ballot contains a clear indication that the voter has made a definite choice, the ballot shall be presented to the county canvassing board for a determination." §102.166(5)(c), Fla Stat.[6]  Therefore, not only has the State adopted uniform procedures to address mismarked ballots, it also has adopted a mechanism by which determinations of intent can be reviewed by the county

---

[6] Rule 1S-2.031 of the Florida Administrative Code also provides that the representative of a political party or candidate may enter an objection to the counting team's decision regarding the ballot.  If so, the ballot will be presented to the canvassing board for a determination.

12

canvassing board. These protections, in connection with the machine and manual recount provisions, are sufficient to satisfy the requirements of *Bush v. Gore*.

Finally, if the Plaintiffs obtain their desired relief - the imposition of a standardless recount – then other parties, relying on *Bush*, could obtain a legal remedy to halt any manual recount from occurring. Rather than fashioning a court-adopted remedy, the *Bush* Court concluded that the only appropriate remedy was to halt any manual recount that could not comport with the minimum constitutional requirements. *Bush*, 531 U.S. at 110. Thus, to the extent this Court invalidates the Uniform Provision, Florida will again lack any uniform, statewide guidance to determine voter intent resulting in 67 county canvassing boards (and many more recount teams) employing their own subjective standards – the precise situation that the U.S Supreme Court found to be unconstitutional. Accordingly, if the Court invalidates any part of the Uniform Provision, the state will be thrown back into a "standardless manual recount" that will again be unable to proceed because it violates the Equal Protection Clause. *Id.* at 103. This result is surely not what the Plaintiffs desire.

### B. The Plaintiffs cannot clearly establish irreparable harm.

The Plaintiffs' claims about irreparable harm also ring hollow. They have presented no evidence that there are any undervotes or overvotes that would be excluded by the Uniform Provision. The Plaintiffs broadly speculate regarding the

13

impact of the Uniform Provision, but can make no definitive statement on the issue. DE 3-1 at 17, 22. This Court simply cannot find irreparable harm based on the naked assertions before it. "When faced with underdeveloped 'evidence regarding the practical consequences of [an election law], we find ourselves in the position of Lady Justice: blindfolded and stuck holding empty scales.'" *Feldman v. Reagan*, 843 F.3d 366, 388 (9th Cir. 2016) (citation omitted).

The Plaintiffs also cannot demonstrate irreparable harm because of their delay in bringing this suit. Again, fifteen manual recounts have occurred since implementation of the Uniform Provision in 2002, with ten of those occurring since 2008. "A preliminary injunction requires showing 'imminent' irreparable harm." *Wreal LLC v. Amazon.com*, 840 F.3d 1244, 1248-49 (11th Cir. 2016). A "delay in seeking a preliminary injunction of even only a few months—although not necessarily fatal—militates against a finding of irreparable harm." *Id*. at 1248-49; *see also Tutoringzone v. Skoolers Tutoring Ctr., LLC*, 2017 U.S. Dist. LEXIS 219630 (N.D. Fla. Dec. 17, 2017) (citing *Wreal* and denying injunction in part based on seven-month delay in bringing suit). "Indeed, the very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights…" *Wreal*, 840 F.3d at 1248.

### C. The Plaintiffs cannot clearly establish that the equities and the public interest favor extraordinary relief.

The equities and public interest decidedly weigh against extraordinary relief. "Call it what you will—laches, the *Purcell* principle, or common sense—the idea is that courts will not disrupt imminent elections [or in this case *ongoing* elections] absent a powerful reason for doing so." *Crookston v. Johnson,* 841 F.3d 396, 398 (6th Cir. 2016) (citing *Purcell v. Gonzalez,* 549 U.S. 1, 5–6 (2006)).[7] "Courts have imposed a duty on parties having grievances based on election laws to bring their complaints forward for pre-election adjudication when possible." *Hendon v. North Carolina State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (citing *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973)); *see also Soules v. Kauaians for Nukolii Campaign Committee*, 849 F.2d 1176, 1180 (9th Cir. 1988). On a related note, "[p]reliminary injunctions of legislative enactments—because they interfere with the democratic process and lack the safeguards against abuse or error that come

---

[7] In *Crookston*, the Sixth Circuit stayed a district court's preliminary injunction, which the plaintiff requested approximately 5 weeks before the 2016 General Election so that he could take a selfie with his ballot. *Id.* at 399. In *Conservative Party of New York State v. New York State Board of Elections,* 2010 U.S. Dist. LEXIS 114155, at *2 (S.D.N.Y. 2010) the district court similarly denied a preliminary injunction where the plaintiffs waited until 6 weeks before an election to file their action. In *Silberberg v. Board of Elections of New York,* 216 F. Supp. 3d 411, 420 (S.D.N.Y. 2016) the district court denied a late-filed action for fear of the disruption. In June of this year, the U.S. Supreme Court held that the balance of equities did not weigh in favor of a request for a preliminary injunction in an election law case where the plaintiffs did not demonstrate reasonable diligence in requesting injunctive relief. *See Benisek*, 138 S. Ct. at 1944.

15

with a full trial on the merits—must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution." *Ne. Fla. Chapter. of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).

The Plaintiffs' request for extraordinary relief is at least 10 years too late. Instead of resolving grievances before the election, the Plaintiffs waited until a week *after* ballots had been cast to sue. If imminence is at all a factor when considering requests for extraordinary relief, then the time for such relief has long since passed. *See Wreal,* 840 F.3d 1244, 1246 (11th Cir. 2016) (affirming denial of preliminary injunction where "the plaintiff pursued its preliminary injunction motion with the urgency of someone out on a meandering evening stroll rather than someone in a race against time").

Delays, confusion, and the potential for errors further militate against granting any extraordinary relief. As the U.S. Supreme Court noted, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24, (2008). The public consequences weigh against extraordinary relief.

## IV. <u>Conclusion</u>

Because the Plaintiffs have failed to clear the high thresholds for the extraordinary relief they seek, the Secretary asks that this Court deny the Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction.

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULES**

The undersigned further certifies that this filing complies with the size, font, and formatting requirements of Local Rule 5.1(C), and that this filing complies with the word limit in Local Rule 7.1(F) because it contains 3,624 words, excluding the case style, signature block, and certificates.

Respectfully submitted by:

BRADLEY R. MCVAY (FBN 79034)
 *Interim General Counsel*
 brad.mcvay@dos.myflorida.com
ASHLEY E. DAVIS (FBN 48032)
 *Deputy General Counsel*
 ashley.davis@dos.myflorida.com
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building Suite, 100
500 South Bronough Street
Tallahassee, Florida 32399-0250
(850) 245-6536 /   (850) 245-6127 (fax)

*/s/ Mohammad O. Jazil*
Mohammad O. Jazil (FBN 72556)
mjazil@hgslaw.com
Gary V. Perko (FBN 855898)
gperko@hgslaw.com
D. Kent Safriet (FBN 174939)
kents@hgslaw.com
Malcolm N. Means (FBN 0127586)
mmeans@hgslaw.com
Hopping Green & Sams, P.A.
119 South Monroe Street, Suite 300
Tallahassee, Florida 32301
Phone: (850) 222-7500 Fax: (850) 224-8551

Dated:  November 15, 2018         *Counsel for the Secretary of State*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served to all counsel of record through the Court's CM/ECF system to the following on this 15th day of November, 2018.

                                           */s/ Mohammad O. Jazil*

                                           Attorney